**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**LORETTA JEAN BERNARDI and**
**SOLOMON HUEBNER-MENDOZA,**
individually and on behalf of all others similarly situated,

Plaintiffs,

vs. **Case No.**: 1:25-cv-06334-GHW-HJR

**NATIONAL DEBT RELIEF, LLC,**

Defendant.

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANT NATIONAL DEBT RELIEF'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1
II. LEGAL STANDARD ........ 2
III. ARGUMENT ........ 3
A. The FAC Sufficiently Alleges That, Utilizing the AdTech Trackers Installed by Defendant, the Advertisers Read and Learned the Contents and Meaning of Plaintiffs' Communications While They Were "in Transit or Passing Over Any Wire, Line, or Cable, or [] Being Sent From, or Received at Any Place Within this State." ........ 5
B. The FAC Sufficiently Alleges Defendant had Sufficient Knowledge that the AdTech Trackers Would Intercept Website Communications and that Defendant Acted Intentionally to Install the AdTech Trackers for That Very Purpose. ........ 10
C. The Rule of Lenity is Not Applicable Here. ........ 15
IV. CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) .......... 3

*Balestrieri v. SportsEdTV, Inc.*,
2025 WL 2776356 (N.D. Cal. Sept. 16, 2025) .......... 12

*Bell Atl. Corp. v. Twombly*,
559 U.S. 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) .......... 3

*Campbell v. Facebook Inc.*,
77 F.Supp.3d 836 (N.D. Cal. 2014) .......... 10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163, 973 P.2d 527 (1999) .......... 10

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F.Supp.3d 369 (S.D.N.Y. 2024) .......... 11

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......... 7

*D'Angelo v. Penny OpCo, LLC*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 7

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) .......... 7, 12

*Esparza v. UAG Escondido A1 Inc.*,
2024 WL 559241 (S.D. Cal. Feb. 12, 2024) .......... 7

*Gray v. Luxottica of Am., Inc.*,
2024 WL 5689566 (C.D. Cal. Dec. 16, 2024) .......... 7

*Halebian v. Berv*,
644 F.3d 122 (2d Cir. 2011) .......... 9

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 7

*James v. Walt Disney Company*,
701 F.Supp.3d 942 (N.D. Cal. Nov. 8, 2023) .......... 11, 12, 14

*Jane Doe v. Eating Recovery Center LLC*,
--- F.Supp.3d ---, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) .......... 8, 9, 16

*Koch v. Christie's Intern. PLC*,
699 F.3d 141 (2d Cir. 2012) .......... 3

*Licea v. the Finish Line, Inc.*,
No 23STCV22390 (Cal. Sup. Ct. Jul. 10, 2024) .......... 14, 15

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020) .......... 3

*M. H. v. Done Glob. Inc.*,
2025 WL 629613 (N.D. Cal. Feb. 26, 2025) .......... 12

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) .......... 15

*Mata v. Zillow Grp., Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) .......... 7

*Mitchell v. Sonesta International Hotels Corporation*,
2024 WL 4417172 (C.D. Cal. Oct. 4, 2024) .......... 16

*Myers v. Moore*,
326 F.R.D. 50 (S.D.N.Y. 2018) .......... 9

*New York v. U.S. Dep't of Com.*,
315 F. Supp. 3d 766 (S.D.N.Y. 2018) .......... 3

*R.C. v. Walgreen Co.*,
733 F.Supp.3d 876 (C.D. Cal. 2024) .......... 11

*Riganian v. LiveRamp Holdings, Inc.*,
791 F.Supp.3d 1075 (N.D. Cal. 2025) .......... 16

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) .......... 7

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) .......... 10, 11

*Smith v. Yeti Coolers, LLC*,
754 F.Supp.3d 933 (N.D. Cal. Oct. 21, 2024) .......... 14

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) .......... 7

*Torres v. Prudential*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .......... 8

*U.S. v. Gonzalez*,
407 F.3d 118 (2d Cir. 2005) .......... 16

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......... 11

*United States v. Scott*,
990 F.3d 94 (2d. Cir. 2021) .......... 16

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 14

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) .......... 7

**Statutes**

Cal. Pen. Code § 631(a) .......... 2
Cal. Penal Code § 631(a) .......... 3, 9, 10
Cal. Penal Code § 637.2 .......... 2

**Other Authorities**

Michael D. Sousa, *Debt Stigma and Social Class*, 41 SEATTLE U. L. REV. 965 (2018) .......... 1

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 2, 9

## I. INTRODUCTION

Personal debt is a sensitive topic—accompanied by stigma and shame—that people want to keep private. People are loath to reveal to others (even those close to them) they are in debt and especially how deep.[1] Any company engaged in the debt relief business should be keenly aware of these sensitivities. Defendant National Debt Relief, however, disregards these privacy concerns from the get-go.

Defendant's primary means for engaging with new customers is its website (https://www.nationaldebtrelief.com) ("Website"). First Amended Complaint, Dkt. No. 6 ("FAC") ¶ 22. When debtors first access that Website, Defendant immediately prompts them to disclose that they are in debt, their current amount of debt, as well as personally identifiable information like their name, phone number, email address, physical address, and date of birth. *Id.* ¶¶ 23-27. As detailed in the FAC, Defendant deliberately installed AdTech Trackers[2] on its Website so that in real time—while the application is being completed—these highly-sensitive communications are surreptitiously intercepted and digested by third-party AdTech Companies without the debtors' consent. *Id.* ¶¶ 29-32, 39, 42, 45, 55-60, 69-72, 75-76, 78-80, 84-85, 90-91, 94, 98-99. These AdTech Companies include some of the largest behavioral advertising companies in the world – Meta, Google, X, TikTok, Microsoft, The Trade Desk, and Claritas. *Id.* ¶¶ 33-95. The AdTech Companies then use that illegally obtained information to build profiles on the debtors and fuel their highly profitable behavioral advertising networks. *Id.* ¶¶ 8, 33-95. Of course, Defendant profits as well—that is why it unilaterally and deliberately installed the AdTech

---

[1] *See generally* Michael D. Sousa, *Debt Stigma and Social Class*, 41 SEATTLE U. L. REV. 965 (2018); *see also* FAC ¶¶ 103-05.

[2] AdTech Trackers are tags, pixels, beacons, cookies or similar tracking technology installed by Defendant on its Website which were developed by the Advertisers to track communications, information and content. FAC ¶¶ 33-95.

Trackers to intercept content on its Website—so it could use the behavioral advertising to maximize its robust marketing and remarketing practices. *Id*. ¶¶ 5, 98. Indeed, employing the AdTech Companies to capture, learn, and use this highly sensitive debt information is so integral to Defendant's business model that it refuses to stop violating debtors' privacy and instead argues before this Court that it is okay to do so.

Defendant is violating the specific prohibitions of the California Invasion of Privacy Act, Cal. Pen. Code § 631(a) ("CIPA"), because by deliberately installing the AdTech Trackers it aided, employed, and caused the AdTech Companies to learn, use, and/or attempt to learn or use the sensitive debt and personal information intercepted in real time as users communicate them to Defendant on the Website. In addition, Defendant facilitated the AdTech Companies' downstream, continued use of the illegally intercepted content to fuel their highly profitable surveillance and behavioral advertising operations. Defendant systematically engaged in this illegal conduct without the consent of the Plaintiffs, the Class Members or any of its Website users. *Id.* ¶¶ 3, 6, 9, 38, 102, 114, 121, 142. Accordingly, pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class members are entitled to injunctive relief as well as damages in the amount of $5,000 or three times the actual amount of damages, whichever is greater.

In its Motion to Dismiss, Defendant contends Plaintiffs' FAC includes insufficient allegations to support a violation of CIPA. As set forth below, consistent with the well-developed jurisprudence in this AdTech technology context, the detailed allegations in the FAC are more than sufficient to survive a motion to dismiss.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *New York v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766, 780 (S.D.N.Y.

2018). A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 559 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To plead such a case, a plaintiff's factual allegations must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When construing a complaint's factual allegations, the Court should "accept as true all the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir. 2012). A complaint is legally sufficient when it plausibly states a claim to relief by raising "more than a sheer possibility" that discovery will reveal evidence of wrongdoing. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

## III. <u>ARGUMENT</u>

The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630–38 ("CIPA") and was enacted to protect the privacy of Californians: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." CIPA § 630.

Cal. Penal Code § 631(a) provides that any person who commits one of the following four acts is liable under the statute:

1. "who by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or . . ."

2. "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or . . ."

3. "who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or . . ."

4. "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

Plaintiffs allege Defendant violated the fourth clause by aiding, agreeing with, employing, and conspiring with the Advertisers to violate the second clause (illegally *learning* the contents of communications) and third clause (illegally *using* the information harvested from those interceptions).[3] Defendant violated the fourth clause by deliberately installing the Advertisers' Trackers on its website so that they would intercept and harvest Plaintiffs' communications in real time. FAC. ¶ 3, 5 7-8, 33-102. Through the installation of the AdTech Trackers, Defendant thus enabled and caused the AdTech Companies to violate the second clause by using their Trackers to read, or attempt to read, or to learn the contents or meaning of the Plaintiffs' communications while they were in transit, while they were passing over any wire, line, or cable, and while they were being sent from a place within California (e.g. Hopland and Fresno, California). *Id*. ¶ 12-13, 112-124. Among other things, the AdTech Companies learned in real time that Plaintiffs were in debt, the amount of their debt, and personal information like their name, phone number and email address. *Id.* Then, in violation of the third clause, the Advertisers used that information obtained

[3] Defendant battles two straw men in its motion. First, in Section I of its Argument, Defendant argues that it is not liable for direct violation of clause one through three. The FAC never alleges such. Second, in section II(A)(1) it argues that the first clause is not in play. Again, the FAC makes no such allegation.

to build and supplement profiles on Plaintiffs and to fuel their behavioral advertising businesses. *Id*. ¶¶ 33-95. Defendant did all this for the specific purpose of causing the Advertisers to extract communications and interactions to serve targeted advertising to its past, current, and potential customers, including Plaintiffs and the members of the proposed Class. *Id*. ¶ 5, 8, 33-95,115, 122.

Defendant's Motion makes two primary arguments in favor of dismissal. First, Defendant argues that the FAC fails to allege sufficiently that the sensitive debt and personal information were learned while the communications were "in transit…or [] being sent from, or received at any place within this state," and, therefore, fails to satisfy either the second or third prongs of § 631(a). Motion at 7-11. Second, Defendant argues that the FAC fails to allege (i) that Defendant had sufficient knowledge that the AdTech Trackers would intercept Website communications in violation of the statute and (ii) that Defendant acted intentionally to aid or employ the AdTech Trackers to commit those interceptions of Website communications. Motion at 11-12. As detailed below, both arguments fail because they disregard the detailed allegations in the FAC that support each element of the CIPA claim and because they are premised on incorrect characterizations of the applicable law.

**A. The FAC Sufficiently Alleges That, Utilizing the AdTech Trackers Installed by Defendant, the Advertisers Read and Learned the Contents and Meaning of Plaintiffs' Communications While They Were "in Transit or Passing Over Any Wire, Line, or Cable, or [] Being Sent From, or Received at Any Place Within this State."**

Plaintiffs' FAC provides detailed allegations of how the AdTech Trackers Defendant intentionally installed on its Website systematically intercept and learn the contents of all users' (including Plaintiffs and all Class Members) communications *contemporaneous* with the sending, transmission, and receipt of the communication. We will briefly walk through those. First, Paragraphs 22-29 (and Figures 1-8) of the FAC set the stage by providing screenshots of the webpages through which Plaintiffs communicated the sensitive information, including their debt

amount, their name, phone number, email address, physical address, date of birth, and social security number. These paragraphs illustrate that the application process consists of a series of webpages with online forms comprising a multi-step application preceding the point at which a user officially submits the application. Next, Paragraphs 29-32 generally describe how Defendant deliberately installed the AdTech Trackers and configured them to systematically intercept communications on the Website in real time, while users proceed through this online application. Then, Paragraphs 33-95 *specifically* describe for *each* of the seven Advertisers that (i) Defendant installed and configured each AdTech Tracker (in violation of the fourth clause), (ii) each AdTech Tracker systematically intercepted and learned communications on the Website in real time (in violation of the second clause), and (iii) each AdTech Company also used the illegally intercepted content downstream to fuel their highly profitable behavioral advertising networks (in violation of the third clause). For each AdTech Company, the FAC alleges that the interceptions systematically occur in real time as the user inputs the information into the Website, often even providing Figures (see Figures 9-13) that show with split-screens how, as the user inputs the information into the Website, the AdTech Company intercepts the content, digests it, and even categorizes it instantaneously in real time. These specific allegations of contemporaneous, real-time interception are detailed for each of the seven Advertisers, specifically Meta (¶¶ 39-40 and Figures 9-10), Google (¶ 56 and Figures 11 and 12), X (¶¶ 66, 71-72), Microsoft (¶¶ 75-76); TikTok (¶¶78-80 and Figure 13); The Trade Desk (¶¶ 84-85), and Claritas (¶¶ 91-93).

At the pleading stage, where all *factual* inferences are construed in Plaintiffs' favor, the FAC's detailed factual allegations, complete with figures demonstrating the real-time interception, are more than sufficient to survive a motion to dismiss. It is well-recognized across the jurisprudence that "allegations that [communications] are intercepted in real time through the

use of computer code provides sufficient factual detail to support the 'in transit' requirement." *Mata v. Zillow Grp., Inc.*, No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024) (quoting *Esparza v. UAG Escondido A1 Inc.*, 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024)). Indeed, Plaintiffs' detailed allegations go beyond the initial pleading requirements. "On a motion to dismiss, a plaintiff need not prove their theory of interception, but rather must provide fair notice to [d]efendants of when they believe [the defendant] intercepts their communications." *Gray v. Luxottica of Am., Inc.,* No. 8:24-CV-00160-MRA-DFM, 2024 WL 5689566 at *7 (C.D. Cal. Dec. 16, 2024) (internal quotes removed). Defendant is undoubtedly on fair notice.

Courts have cautioned that "a pleading standard to the contrary would require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant and its third-party recorder." *D'Angelo v. Penny OpCo, LLC*, No. 23-cv-0981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023). This reasoning is reflected in numerous opinions. *See, e.g., Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 862-63 (C.D. Cal. 2024); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894 (S.D. Cal. 2025); *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-CV-00667-JST, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053-54 (N.D. Cal. 2025); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 838-39 (E.D. Cal. 2025); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1030-31 (S.D. Cal. 2023).

Oddly, rather than contending that the relevant paragraphs of the FAC are insufficient, Defendant simply ignores *every* paragraph cited above that concerns contemporaneous interception and instead refers only to the paragraphs of the FAC that concern violations of the

third prong of CIPA. Motion at 8-9. But the fact that the FAC *also* sufficiently pleads[4] violations of the third prong of CIPA does not negate or erase the preceding allegations demonstrating violations of the second prong.

Defendant's reliance on *Torres v. Prudential*, No. 22-cv-07465 (CRB), 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) is misplaced. First and foremost: the session replay technology at issue in *Torres* is unlike the AdTech technology NDR installed (and, in fact, is not advertising technology at all). 2025 WL 1135088, at *1. The technology at issue in *Torres* was not alleged to have used data collected from website users for its own independent purposes (and never for advertising).[5] *Id*. at *4. In fact, the only third-party access to data alleged in *Torres* was access granted to a limited number of employees on an ad hoc basis for the specific purpose of assisting website owners resolve troubleshooting issues. *Id.* at *1. *Torres* did not allege the defendant installed the challenged technology for any purpose other than its own ability to access and review secure, encrypted records of its users' interactions with its website, which occurred through a web portal accessible only with the defendant's specific authorization (i.e., for troubleshooting purposes). *Id.* Critically, *nothing* in *Torres* suggested the third party learned or read, or even attempted to learn or read the contents of any communications contemporaneous with their transmission. *Id*.

NDR's reliance on *Jane Doe v. Eating Recovery Center LLC*, --- F.Supp.3d ---, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ("ERC"), is equally distinguishable for a simpler reason: *ERC*

---

[4] Defendant implicitly concedes that the FAC sufficiently pleads that the Advertisers used the improperly obtained information. Instead, its only argument related to the third prong of CIPA, is the erroneous contention (as demonstrated above) that the FAC does not sufficiently plead the prerequisite violations of the second prong. *See* Motion at 10.

[5] 2025 WL 1135088, at *4 (finding third party could use data it collected, but plaintiffs did not show that the third party did independently use the collected information).

was decided on a motion for summary judgment, after completion of discovery. 2025 WL 2971090 at *3. Contrary to Defendant's request, this Court cannot reject the truthfulness of the allegations in the FAC based on another court's conclusions at summary judgment grounded in the developed factual record of another case. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) ("The court therefore does not ordinarily look beyond the complaint and attached documents in deciding a motion to dismiss brought under [Rule 12(b)(6)]."); and *Myers v. Moore*, 326 F.R.D. 50, 58-9 (S.D.N.Y. 2018) (holding decision to dismiss made only on allegations of complaint converts motion for summary judgment to motion to dismiss). In addition, *ERC* involved only one (Meta) of the seven AdTech tracking technologies relevant in this case. However, as to the single technology it examined, the *ERC* court reached conclusions that are counter to the allegations in the FAC. For example, the *ERC* court refers to Meta's AdTech technology as simply "third party software to track website activity" 2025 WL 2971090 at *1, whereas the FAC details how Meta (alongside six other AdTech Companies) reads, learns, and categorizes communications in real time and uses that intercepted content to build profiles and fuel highly-sophisticated behavioral advertising. FAC ¶¶ 33-48.

Also, *ERC* found that the interceptions did not occur while the communications were "in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a). In contrast, the FAC—complete with figures showing the forensic analysis—details how Meta read, digested, and categorized the communications in real time as Plaintiffs typed them into the application forms on the Website and sent them from places in California. *Id.* At some level, litigation is comparable to a children's game of the "telephone", where the actual facts are vulnerable to misconstruction as they are presented in discovery, distilled and characterized in briefing and trial presentations, and finally digested by

the factfinders (juries at trial and judges at summary judgment). At some point in *ERC*, the message appears to have been garbled. Plaintiffs are confident that *in this case* the factual allegations of the FAC will be borne out in discovery for the Meta technology as well as the six other AdTech Companies whose technology Defendant installed on its Website.[6]

### B. The FAC Sufficiently Alleges Defendant had Sufficient Knowledge that the AdTech Trackers Would Intercept Website Communications and that Defendant Acted Intentionally to Install the AdTech Trackers for That Very Purpose.

Courts consistently hold that allegations that a defendant who intentionally installed AdTech tracking technology to monitor, track, capture, and disclose users' online communications, just like those NDR operates on its Website, demonstrate sufficient knowledge and intent to hold the defendant liable for aiding, agreeing with, employing, or conspiring with another to violate CIPA. For example, in *Smith v. Rack Room Shoes, Inc.*, the Court ruled:

> Plaintiffs have adequately alleged intent. First, Plaintiffs allege that Rack Room affirmatively embedded Meta Pixel and Attentive Tag into its website. [] Second, Plaintiffs allege that the purpose of Meta and Attentive's code is to "track[ ] the people and type of actions

[6] The *ERC* opinion opens with the Court venting its frustration that the California Legislature has not "step[ped] up" and amended CIPA as eavesdropping technologies change over time. 2025 WL 2971090, *1. However, CIPA litigation concerning the unconsented interception of internet communications has played out for more than a decade. *See, e.g., Campbell v. Facebook Inc.*, 77 F.Supp.3d 836, 848 (N.D. Cal. 2014). And, as discussed above, there is a well-developed body of law regarding the sufficiency of allegations at the pleading stage in the AdTech context relevant to this case. If anything, the fact that the California Legislature has not amended CIPA in response to this jurisprudence should be construed as a conclusion that no amendment has been deemed warranted. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 178, 973 P.2d 527, 538 (1999) (discussing legislative acquiescence as support that the legislature approves of judicial statutory interpretations in light of the California Legislature's noted history of amending statutes to overrule judicial interpretations). Moreover, CIPA expressly states a legislative interest in protecting Californians from advancements in science and technology and the development of new devices and techniques: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 631(a).

> they take" and provide "a treasure trove of insights about [ ] customers' shopping habits, like their browsing and purchasing history." [] Therefore, it is plausible to infer from Rack Room's alleged affirmative act of integrating the third-party code into its website that it knew Meta and Attentive would intercept personally identifiable information and that Rack Room had the purpose of employing Meta and Attentive to do so.

No. 24-CV-06709-RFL, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (citation modified) (citing *James v. Walt Disney Company*, 701 F.Supp.3d 942, 954-55 (N.D. Cal. Nov. 8, 2023) ("Plaintiffs have the stronger position. As they maintain, it can reasonably be inferred that Disney entered into a contractual arrangement with Oracle under which Oracle would collect information from EPSN.com website users *so that Disney could market to and attract new customers*.") (emphasis in original).

Similarly, in *R.C. v. Walgreen Co.*, the court concluded:

> Plaintiffs allege that Defendant intentionally utilized tracking technologies to collect, use, and distribute Plaintiffs' sensitive information to third parties like Facebook. [] Plaintiffs specifically allege that Defendant intentionally configured the Pixels to capture the 'characteristics" of users' communications with Defendant's websites, including their IP addresses and Facebook IDs, as well as the "content" of users' communications, which includes the links, pages, and tabs users click and view and the search terms they employ. [] These allegations, taken as true and viewed in the light most favorable to Plaintiffs, demonstrate that Defendant "acted consciously and deliberately with the goal of intercepting wire communications."

733 F.Supp.3d 876, 902 (C.D. Cal. 2024) (quoting *United States v. Christensen*, 828 F.3d 763, 776 (9th Cir. 2015)) (citation modified).

Multiple courts have ruled the same in the AdTech context relevant here. *See, e.g.*, *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F.Supp.3d 369, 382 (S.D.N.Y. 2024) ("The FAC also plausibly alleges that Mount Sinai engaged in such disclosures knowingly and deliberately. It alleges that . . . Mount Sinai configured Facebook's Business Tools, to capture 'PageView,'

'Microdata,' and 'SubscribedButtonClick' events, and . . . that Mount Sinai had an economic motive—to improve its marketing—to install the Pixels and CAPI."); *Balestrieri v. SportsEdTV, Inc.*, No. 25-CV-04046-SK, 2025 WL 2776356, at *11 (N.D. Cal. Sept. 16, 2025) ("Here, Plaintiff alleges that Defendant 'knowingly installed the Facebook pixel on the Website' and 'knowingly caused the Facebook IDs of Plaintiff and the Class to be disclosed to Facebook.'" [] Accordingly, Plaintiff has sufficiently pled intent."); *M. H. v. Done Glob. Inc.*, No. 24-CV-03040-RFL, 2025 WL 629613, at *2 (N.D. Cal. Feb. 26, 2025) ("The Complaint alleges that Done purposefully installed these tracking technologies—which Done knew would invisibly transmit a user's website communications to third-party companies to facilitate ad retargeting—to optimize its own advertising and marketing."); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 839–40 (E.D. Cal. June 9, 2025) ("At the motion to dismiss stage, Plaintiffs' allegations [that defendant chose to install the pixel and thereby assisted Meta to intercept communications] are sufficient to plead that Defendants' either aided, agreed, employed, or conspired with Meta in the alleged interception of their information and data without their consent within the meaning of CIPA.").

Here, the FAC's allegations closely track the allegations found sufficient in all the cases discussed above. Plaintiffs allege NDR intentionally and unilaterally installed the AdTech Trackers on its Website with the full understanding that the technology's purpose was to enable the Advertisers to intercept the content of its customers' and potential customers' communications on the Website. FAC ¶¶3, 7, 29-32, 97-99 (*see also James*, 701 F.Supp.3d at 955 (finding intent on the basis that the tracking technology cannot exist on a website without the permission of the website operator)). Defendant knowingly engaged in this intentional conduct not just once but *over and over* again. At least *seven* times, Defendant unilaterally and purposefully aided the Advertisers to violate CIPA by installing their AdTech Trackers and specifically configuring that

technology so that the Advertisers would learn the contents of sensitive personal and financial communications.[7]

Not only did Defendant know that the AdTech Trackers enabled seven AdTech Companies to intercept sensitive communications, it also knew the Advertisers would use that intercepted content to fuel their highly profitable behavioral advertising networks; indeed, Defendant's primary motivation for installing the AdTech Trackers was so it could economically benefit from the resulting behavioral advertising.[8] After applying for debt relief services on the Website, both Plaintiffs received advertisements and phone calls from Defendant and additional debt relief

[7] FAC ¶ 42 ("Defendant configured a Meta product called Conversions API to disclose personally identifiable information to Meta as well."), ¶ 60 ("NDR configured the Google Analytics code on the Website to transmit users' amounts of debt, full names, email addresses, phone numbers, and IP addresses to Google."), ¶ 71 (Due to NDR's integration of the X Pixel, X can identify specific individuals that communicate with NDR via its Website as well as the contents of such communications."), ¶ 75 ("Like Meta's Google's, and X's online tracking technologies, Microsoft's UET Tag relies on identifiers stored within cookies to uniquely identify online individuals and allows Microsoft to obtain records of exactly what communications users send to websites that implement its technology, including NDR.") ¶ 80 ("NDR configured and installed the TikTok Pixel on the Website to send back to TikTok the _ttp cookie in conjunction with communications users submit when applying for debt relief services on the Website.") ¶ 84 ("NDR integrated the TD Pixel into its Website, configuring the information it would intercept and transmit back to the Trade Desk."), ¶ 91 ("NDR configured [the Claritas Pixel] to transmit users' debt amounts, full names, email addresses, and phone numbers back to Claritas[.]")

[8] FAC ¶ 5 ("NDR…obtain[ed] a pecuniary benefit from NDR's installation of such tracking technologies. NDR benefits from…improved advertising and marketing capabilities provided by the Advertisers" which "lead[s] to increased profits. NDR purposefully traded its users' sensitive personal and financial information in exchange for these benefits."); ¶ 8 ("NDR benefits from such data-driven advertising practices …by enhancing the effectiveness of the advertisements NDR places on the Advertisers' ad networks[.]"); ¶ 98 ("NDR agreed to use, configured, employed, and maintains the third party tracking technology on its Website, aiding the Advertisers to learn, use, and attempt to learn or use Website users' online communications and their sensitive personal and financial information. In return, the Advertisers provide NDR with benefits associated with their online web presence. NDR's aiding the Advertisers' interception of users' sensitive personal and financial information was and is deliberate."); ¶ 106 ("Despite these ubiquitous and universally appreciated privacy norms, NDR shares its users' sensitive, personal financial communications with a host of undisclosed Advertisers to obtain a better return on its marketing investments.")

companies, demonstrating that Defendant's purposeful installation of the AdTech Trackers was effective. *Id*. ¶ 115, 122.

Defendant's reliance on *Smith v. Yeti Coolers, LLC*, 754 F.Supp.3d 933 (N.D. Cal. Oct. 21, 2024) and *Licea v. the Finish Line, Inc.*, No 23STCV22390 (Cal. Sup. Ct. Jul. 10, 2024) is misplaced. Unlike here, in both cases, the operative complaint failed to allege that the defendant itself installed and configured the offending tracking technology or that the defendant's purpose was to utilize the illegally intercepted content for its own economic gain.

*Yeti* involved a third party software vendor that Yeti employed to facilitate online payments and to provide fraud prevention. 754 F.Supp.3d at 938. The fraud prevention service involved the third party's collection of user interaction data from Yeti's website users, but the *Yeti* plaintiff did not sufficiently allege that Yeti was aware the fraud prevention services were using the data collected from Yeti's own users or that Yeti installed the software in order to collect such data. *Id* at 942-43. Accordingly, courts have found *Yeti* easily distinguishable from the AdTech technology context here. For example, in *Walsh v. Dollar Tree Stores, Inc*. the court distinguished a defendant's intentional installation of AdTech Trackers (the same conduct here) from Yeti's engaging a third party for payment processing and fraud prevention services:

> Here, as in *James v. Disney*, the Court can reasonably infer from Plaintiffs' allegations that Dollar Tree entered into agreements with the identified third parties to place cookies on the devices of consumers who visit Dollar Tree's website . . . Moreover, *YETI Coolers* dealt with a third-party payment processor and fraud prevention service such that any marketing might be unknown and unintended to the defendant. In contrast, here it can be plausibly inferred that the reason Dollar Tree "caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data" . . . is that Dollar Tree intends to do so. At the pleading stage, the Court must draw all reasonable inferences in favor of the Plaintiffs.

No. 25-CV-01601-SVK, 2025 WL 2939229 at *17 (N.D. Cal. Oct. 16, 2025) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation modified).

Similarly, *Finish Line* involved the installation of a chat feature technology which recorded users' communications via the chat feed on Finish Line's website, and, as alleged by the plaintiff, also shared the communications with Meta. No. 23STCV22390 at 2-3. The *Finish Line* court found it persuasive that the plaintiff's only allegations that Finish Line had knowledge and intent to aid a third party in learning the contents of their communications was based on marketing and advertising materials Finish Line may or may not have read. No. 23STCV22390 at 5. Nothing in the case suggested Finish Line specifically configured the third-party technology, much less configured it to share specific types of sensitive communications. In contrast, here, Plaintiffs allege Defendant deliberately and unilaterally installed and configured seven AdTech Trackers for the specific purpose of enabling them to intercept financial communications directly from its Website. FAC ¶¶ 29-95.

In the end, Defendant is arguing with the pleadings, rather than demonstrating their insufficiency. If Defendant wants to convince this Court that it did not intentionally install and configure AdTech Trackers to enable seven AdTech Companies to intercept Website communications, and that it did not (and does not continue to) utilize the AdTech Companies' ill-gotten gains from those interceptions to fuel behavioral advertising for its own economic benefit, it can bring forth a witness to say that (and be cross-examined) as the case progresses. But that is for another day. It cannot argue with the well-pleaded allegations of the FAC, and Plaintiffs are confident that those well-pleaded allegations will be borne out as discovery progresses.

**C. The Rule of Lenity is Not Applicable Here.**

Although the Rule of Lenity can be applied to civil applications of criminal statutes, the rule only applies when interpreting "grievous ambiguities" in statutes, such that the court can only

"guess" what the statute intends. *United States v. Scott*, 990 F.3d 94, 121 (2d. Cir. 2021) ("[T]he rule of lenity is the last canon of construction, applicable only if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what congress intended.") (citation modified). In addition, the Rule of Lenity *only* extends to ambiguities in legal issues and not factual issues, where inferences must be drawn in Plaintiffs' favor at the pleading stage. *U.S. v. Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005).

Although Judge Chhabria applied the rule in *ERC*, 2025 WL 2971090 at *1, other courts disagree, finding CIPA's language lacks the "grievous ambiguity" required to apply the rule of lenity. *See Riganian v. LiveRamp Holdings, Inc.,* 791 F.Supp.3d 1075, 1093-94 (N.D. Cal. 2025); and *Mitchell v. Sonesta International Hotels Corporation*, No. CV-24-2603-GW-SSCx, 2024 WL 4417172 at *9 (C.D. Cal. Oct. 4, 2024) (denying motion to dismiss based on rule of lenity for CIPA § 631 claim for aiding and abetting).

Moreover, even if CIPA presented "grievous ambiguities," it makes no difference in analyzing the FAC's allegations, which provide a straightforward statement that Defendant violated even the narrowest interpretations of CIPA, alleging: (i) Defendant installed AdTech tracking technology; (ii) Defendant configured and successfully operated the AdTech Trackers which caused the AdTech Companies to learn—in real-time while the debt relief application loads on the users' screens—the contents of users' communications with Defendant (including sensitive communications of personal and financial information); and (iii) Defendant fully understood that its installation of these *seven* AdTech Trackers would cause the AdTech Companies to use the contents of such communications for their own business purposes of directing targeted, behavioral advertising. To top it off, Defendant understood the AdTech Companies' learning and using the

contents of its users' communications would result in improved marketing results for Defendant itself, and installed the technology to achieve that very purpose.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request the Court deny Defendant's Motion to Dismiss their FAC.

### Leave to Amend

Plaintiffs are confident the allegations in the FAC are more than sufficient to meet the pleading standards. However, should the Court conclude an amendment is necessary, Plaintiffs are prepared to amend their complaint to provide any additional details the Court may deem necessary.

Dated: December 8, 2025

Respectfully submitted,

*/s/ Samuel R. Jackson*

Samuel R. Jackson (SBN 5332325)
Hank Bates (*pro hac vice* forthcoming)
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Tel: (501) 312-8500
Fax: (501) 312-8505
Email: sjackson@cbplaw.com
Email: hbates@cbplaw.com

*Attorneys for Plaintiffs*

**WORD COUNT CERTIFICATION**

Pursuant to Local Rule 7.1, I hereby certify that Plaintiffs' Opposition to Defendant's Motion to Dismiss contains 5,640 words, inclusive of footnotes and excluding any captions, indexes, tables, signature blocks, and required certificates. The word count is based on the word count feature of the word-processing program used to prepare the document.

*/s/ Samuel R. Jackson*
Samuel R. Jackson

**CERTIFICATE OF SERVICE**

I certify that on December 8, 2025, I directed a true and correct copy of the foregoing to be served via the electronic filing system upon the following counsel of record:

J. Matthew Thornton
Ballard Spahr LLP
2000 IDS Center 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 371-3211
Fax: (612) 371-3207
Email: thorntonj@ballardsphar.com

Gregory Szewczyk
Alexia C. Chapman
Ballard Spahr LLP
1800 Larimer Street, Suite 1600
Denver, CO 80202
Telephone: (303) 299-7382
Facsimile: (303) 296-3956
Email: szewczykg@ballardspahr.com
Email: chapmana@ballardspahr.com

*/s/ Samuel R. Jackson*
Samuel R. Jackson